**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DEEJAIZ LLC *et al.*,

                Plaintiffs,

        v.

TOWNSHIP OF FRANKLIN *et al.*,

                Defendants.

Civil Action No. 23-3192 (MAS) (RLS)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

    This matter comes before the Court upon Defendants the Township of Franklin, New Jersey (the "Township of Franklin" or "Township"), Vincent Lupo ("Lupo"), Doug Kowalsky ("Kowalsky"), John Hauss ("Hauss"), Andrew Dominach, Jr. ("Dominach"), and Sapana Shah's ("Shah") (the "Individual Defendants" and collectively with the Township, "Defendants"[1]) Motion to Dismiss Plaintiffs Deejaiz LLC d/b/a Supreme Productionz ("Supreme"), Jason Robinson, and Danyale Robinson's (collectively, "Plaintiffs") Complaint (ECF No. 1-2). (ECF No. 3.) Plaintiffs opposed the Motion (ECF No. 7), and Defendants replied (ECF No. 11). The Court has considered the parties' written submissions and decides the Motion without oral argument, pursuant to Local Civil Rule 78.1.

    For the reasons set forth below, Defendants' Motion to Dismiss is granted.

---

[1] Plaintiffs also name "John Doe, #1-50," and "Mary Roe, #1-50," as Defendants to represent any indispensable parties discovered during the litigation process. (Compl. 3.)

I.      **BACKGROUND**

A.      **The Parties**

Plaintiffs own and operate Supreme, a New Jersey limited liability company that runs a business consisting of social meeting and event spaces to host various events, receptions, parties, and other private gatherings at 2 JFK Boulevard, Somerset, New Jersey (the "Premises"). (Compl. 2-3, ECF No. 1-2; Defs.' Moving Br. 2-3, ECF No. 3-1.) Plaintiffs allege that the events at the Premises were approved by all appropriate departments of the Township of Franklin, including zoning, fire, and construction. (Compl. 3-4.)

Defendant Township of Franklin is a municipal corporation in the State of New Jersey. (*Id.* at 2.) Individual Defendants work for the Township of Franklin. (*Id.* at 2-3.) Lupo is a Construction Official for the Township of Franklin. (*Id.* at 2.) Kowalsky is the Fire Inspector or Fire Marshall for the Township of Franklin. (*Id.*) Hauss is the Director of Fire Prevention for the Township of Franklin. (*Id.* at 2-3.) Dominach is the Economic Development Director for the Township of Franklin. (*Id.* at 3.) Lastly, Shah is the Township Attorney for the Township of Franklin. (*Id.*) Lupo, Kowalsky, Hauss, Dominach, and Shah are natural persons domiciled in New Jersey and are employees, agents, or elected officials for the State of New Jersey. (*Id.*)

B.      **Factual Background**[2]

On October 13, 2020, Plaintiffs filed an application for variance relief with the Township Zoning Board (the "Variance Application"). (Defs.' Moving Br. 2.) The Variance Application sought a D-1 use variance to permit the operation of a social, business, and corporate event suite

---

[2] In both their Complaint and Opposition Brief, Plaintiffs do not provide full details about certain events, including those prior to February 4, 2021 and the Construction Board of Appeals hearing held on June 8, 2022. (*See generally* Compl.; Pls.' Opp'n Br.) The Court, therefore, relies upon Defendants' Motion to Dismiss to summarize relevant events where applicable.

at the Premises. (Compl. 3; Defs.' Moving Br. 2-3.) Specifically, Plaintiffs sought to host events including private bar/bat mitzvahs, birthday parties, bridal showers, baby showers, corporate business meetings, book signings, and fundraisers. (Compl. 3; Defs.' Moving Br. 3.) On December 17, 2020, a public hearing on the Variance Application was held. (Defs.' Moving Br. 3.) Plaintiffs allege that "extensive testimony regarding the nature and types of uses of the [Premises] was taken" for the variance approval. (Compl. at 3-4.)

On February 4, 2021, the Zoning Board passed a resolution granting Plaintiffs' Variance Application, and Plaintiffs obtained use variance approval. (Compl. 3; Defs.' Moving Br. 3.) Defendants state that the approval granted Plaintiffs permission to operate their businesses in a General Business Zone subject to conditions, including but not limited to: (1) "that any improvements would need to be performed in accordance with the testimony set forth before the Zoning Board"; (2) "that . . . Plaintiffs must apply for any building permits prior to commencement of work"; and (3) "that the occupancy of the space would be limited to the lesser of 150 people or the occupancy established by the Township's Fire Code Official." (Defs.' Moving Br. 3.)

Separately, Plaintiffs also filed an Application for Certificate of Continued Building Compliance for approval by the Township. (Compl. 4.) Defendants state that the space for identifying the Use Group was left blank. (Defs.' Moving Br. 4.) Around January 12, 2021, an inspection was conducted regarding the application, and on February 9, 2021, a Certificate of Continued Building Compliance ("Certificate") was issued and signed by Lupo. (*Id.*; *see also* Compl. 4.) According to Defendants, the Certificate was issued for a "B Use Group" and indicated that there were "no obvious violations," although Plaintiffs would "need health department approval for food on site." (Defs.' Moving Br. 4.) Both parties acknowledge that Plaintiffs,

however, were subsequently issued a maximum occupancy placard for an A-3 Use Group. (*Id.*; Compl. 6.)

On or about May 27, 2021, a Notice of Satisfactory Inspection was issued by the Township's Department of Fire Prevention. (Defs.' Moving Br. 4.) Based on the prior approvals, Plaintiffs began operating their business. (*Id.*)

On February 8, 2022, Kowalsky, a Fire Inspector/Marshall for the Township, advised Plaintiffs that he needed to inspect the Premises, and an inspection was arranged for the next day. (*Id.*) During the inspection, Kowalsky informed Plaintiffs that the Director of Fire Prevention for the Township, Hauss, had heard Supreme was hosting events at the Premises that fell outside of the approved Use Group. (Compl. 4; Defs.' Moving Br. 5.) Plaintiffs stated that the events were in accordance with prior approvals received from the Township, and provided physical copies of the approvals. (Compl. 4-5.) Following the inspection, Kowalsky responded with correspondence that he would meet with the Township's Construction Department to determine what may be needed from a "fire safety angle" and advise accordingly. (Compl. 5; Defs.' Moving Br. 5.) Kowalsky wrote that the Township was "not looking to interrupt [Plaintiffs'] business at all" but wanted to ensure "everyone is protected and kept safe." (Compl. 5; Defs.' Moving Br. 5.) Kowalsky requested, and Plaintiffs provided, electronic copies of the prior approvals by e-mail correspondence. (Compl. 4-5; Defs.' Moving Br. 5.) In the correspondence, Plaintiffs also responded that "they were not aware of the issues raised by [Kowalsky's] inspection" but were

eager to resolve them without business interruption and had already contacted someone about the shunt trip system.[3] (Defs.' Moving Br. 5-6.)

On March 9, 2022, the Township Fire Prevention Department issued a Notice of Imminent Hazard and Order to Take Corrective Action (the "Notice"), signed by Hauss. (Compl. 5.) The Notice provided that the inspection revealed violations of the Uniform Fire Code promulgated pursuant to the New Jersey Uniform Fire Safety Act, which "constitute[d] an imminent hazard to the public health, safety or welfare." (Defs.' Moving Br. 6.) Specifically, the Notice stated that Plaintiffs did not have a fire sprinkler system with a shunt trip as required. (*Id.*) The Notice therefore mandated that Plaintiffs cease operations and events on the Premises by noon that day and that Plaintiffs take corrective action. (Compl. 5; Defs.' Moving Br. 6.) Plaintiffs, however, assert that the Notice was not in compliance with local rules because a referral should have been signed by the Construction Official—in this case, Lupo—for action, instead of by Hauss. (Compl. 6.)

On March 11, 2022, Plaintiffs filed an application with the Somerset County Construction Board of Appeals after receiving the Notice, stating that they had operated at the Premises as an A-3 use for over a year without incident. (*Id.*; Defs.' Moving Br. 6-7.) Plaintiffs requested that the Construction Board of Appeals rescind the Notice and authorize Plaintiffs to operate as an A-3 Use Group. (Defs.' Moving Br. 6-7.) Plaintiffs also requested an "immediate meeting" to discuss necessary steps and measures to comply with A-2 Use Group requirements in order to keep

---

[3] Based on the parties' briefs, it is unclear exactly what concerns were revealed through Kowalsky's inspection, although it appears per the subsequent correspondences that Plaintiffs had an inadequate or missing shunt trip, fire alarm, and sprinkler system. The parties do not provide a separate definition of a shunt trip. To briefly explain, "[a] shunt trip is a circuit breaker device that, during a fire, cuts off power to the elevator equipment in a machine room before the fire sprinklers engage." *Lukov v. Schindler Elevator Corp.*, No. 11-201, 2012 WL 5464622, at *1 (N.D. Cal. Nov. 8, 2012), *rev'd*, 594 F. App'x 357 (9th Cir. 2015) (citation omitted).

Plaintiffs' business open. (*Id.* at 7.) Plaintiffs state that after this meeting, Lupo granted Plaintiffs permission to continue holding events at the Premises provided that: (1) two Fire Watch professionals are present at every event; and (2) a detailed list of all events [is] reviewed and approved by Hauss. (Compl. 6-7.)

On March 16, 2022, Hauss and Lupo inspected the Premises and informed Plaintiffs that "minor repairs" were required, which Plaintiffs completed. (*Id.* at 7.) Plaintiffs allege that Hauss and Lupo also requested other repairs that Plaintiffs assert were the landlord's responsibility to resolve. (*Id.*)

On March 21, 2022, Dominach sent Plaintiffs correspondence stating that he was inquiring into alternative sites for Plaintiffs' business based on the outstanding issues. (Compl. 7; Defs.' Moving Br. 8.) On April 7, 2022, Plaintiffs followed up on the correspondence; Dominach replied that suitable locations had not yet been identified. (Compl. 7; Defs.' Moving Br. 8.)

In the meantime, Plaintiffs continued to host events at the Premises pursuant to the Township's conditional approval, as granted by Lupo. (Compl. 6-7; Defs.' Moving Br. 8.) Plaintiffs state that they worked with the landlord to install the fire alarm, sprinkler system, and other mechanisms based on an April 3, 2022 report provided by an expert hired by Plaintiffs ("Expert Report"), which stated that the building required sprinklers. (Compl. 8; Expert Report, ECF No. 3-3.) Plaintiffs allege that the Township approved the repairs. (Compl. 8.)

On April 11, 2022, Shah, the Township Attorney, sent correspondence to Plaintiffs citing various issues on the Premises, including improper use,[4] and revoked the right to operate any events after May 22, 2022. (Compl. 7; Defs.' Moving Br. 9-10.) Shah stated that an event—titled "Boogie Nights"[5]—which Plaintiff intended to host, did not have the appropriate approvals. (Shah Letter, Def.'s Moving Br. Ex. M, ECF No. 3-3.) In particular, the correspondence stated that "[t]he Township ha[d] not received confirmation from [Plaintiffs]" that specific matters—such as the need for "proper health and safety controls required by law including but not limited to sprinklers, fire alarm, the ability to shut off the music and lights"—were addressed. (*Id.*) Finally, the correspondence informed Plaintiffs that the revocation would be lifted if Plaintiffs obtained a valid Certificate for an A-2 Use Group. (*Id.*) Plaintiffs assert the findings were based on inaccuracies and inconsistencies, which Plaintiffs' attorneys communicated to Shah through correspondence on April 11, 2022. (Compl. 8.)

---

[4] Defendants outline the issues as including, but not limited to:

> failure to obtain construction department approvals prior to operating the facility; failure to obtain appropriate health department approvals for serving food; failure to notify the Township of additional events that it intended on hosting despite agreeing to notify the Township of all events during the temporary period where Fire Watch professionals would be onsite; failure to obtain construction code approvals for the change in use; failure to install proper health and safety controls including but not limited to sprinklers, fire alarm, and the ability to shut off music and lights; and obtain an A-2 Certificate of Occupancy.

(Defs.' Moving Br. 10.)

[5] In their Complaint, Plaintiffs explain that the term "boogie nights" originates from the 1970s and was popularized by the 1997 American film titled "Boogie Nights." (Compl. 17.) Plaintiffs further assert that "African American culture and music heavily influenced the disco era and the term 'boogie,' and disco music was heavily popularized by African American artists." (*Id.*)

7

Plaintiffs clarify that their expert determined that the Premises, as used by Plaintiffs, posed no imminent threat or peril. (*Id.* at 9.) Plaintiffs state, however, that on May 18, 2022, Defendants[6] "arbitrarily and capriciously decided to order the business to close" by May 22, 2022. (Compl. 9; Defs.' Moving Br. 11-12.) Plaintiffs state that the decision was made notwithstanding their efforts to provide updates and request an extension on May 15, 2022. (Compl. 9.) Plaintiffs add that mutually agreed upon measures were implemented and that measures to provide adequate fire alarms and a sprinkler system were underway. (*Id.*) To the contrary, Defendants indicate that the May 18, 2022 correspondence notified Plaintiffs "that their inability to become compliant with [the] code by May 22, 2022 [would] require them to cease operations as of that date or the Township [would] have to take appropriate action to vacate the building." (Defs.' Moving Br. 11-12.)

On May 20, 2022, Plaintiffs amended their appeal to the Construction Board of Appeals and a hearing was scheduled for June 8, 2022. (Compl. 9.) Plaintiffs state that they were required to shut down their business operations—likely because Plaintiffs failed to become compliant with the code by May 22, 2022—and allege that they have "sustained great losses in an attempt to maintain [their] name, reputation, and business." (*Id.* at 9.)

On June 6, 2022, Plaintiffs filed a Notice of Tort Claim against the Township. (*Id.*) On June 8, 2022, the Construction Board of Appeals heard argument on Plaintiffs' appeal during which the Construction Board of Appeals took testimony and reviewed evidence. The Construction Board of Appeals found in favor of upholding Defendants' Notice and directed that events are not permitted on the Premises until the requirements of an A-2 Use Group are satisfied. (Defs.' Moving

---

[6] Defendants clarify that Shah wrote to Plaintiffs' counsel on behalf of the Township. (Defs.' Moving Br. 11.)

Br. 15-16.) In holding that the Township's March 9, 2022 Notice was proper, the Construction

Board of Appeals also determined that it was not satisfied that the violation was properly abated

by Plaintiffs. (*Id.* at 16.) Defendants indicate that Plaintiffs did not file an appeal of the

Construction Board of Appeals decision. (*Id.*)

Plaintiffs assert that they have spent a substantial amount of time, money, and resources to

address and resolve "all necessary measures." (Compl. 8-9.) The Complaint alleges that Plaintiffs

have suffered irreparable losses due to the collective actions of the Township and its agents, who

"failed to provide the necessary resources and protection to [Plaintiffs]." (*Id.* at 10.)

### C.    Procedural Background

On May 11, 2023, Plaintiffs filed a seven-count Complaint in the New Jersey Superior

Court. (Defs.' Moving Br. 1-2.) Approximately three weeks later, the Township was served with

the Summons and Complaint. (*Id.*) On June 12, 2023, Defendants removed this matter to this

Court. (Notice of Removal, ECF No. 1.) Defendants subsequently filed a Motion to Dismiss. (ECF

No. 3.) Plaintiffs opposed (ECF No. 7), and Defendants replied (ECF No. 11).

## II.    <u>LEGAL STANDARD</u>

A district court conducts a three-part analysis when considering a motion to dismiss under

Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court must identify

"the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009).

Second, the court must identify and accept as true, all of the plaintiff's well-pleaded factual

allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v.

UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court can discard bare

legal conclusions or factually unsupported accusations that merely state the defendant unlawfully

harmed the plaintiff. *Iqbal*, 556 U.S. at 678 (citing *Twombly v. Bell Atl. Corp.*, 550 U.S. 544, 555

(2007)). Third, the court must determine whether "the [well-pleaded] facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## III.   DISCUSSION

In their Complaint, Plaintiffs assert the following claims against Defendants: (1) violation of the Takings Clause of the Fifth Amendment (Count One); (2) violation of the Equal Protection Clause of the Fourteenth Amendment (Count Two); (3) violation of Title VI of the Civil Rights Act of 1964 (Count Three); (4) violation of the Due Process Clause of the Fourteenth Amendment (Count Four); (5) violation of the Equal Protection Clause of the New Jersey State Constitution (Count Five); (6) Tortious Interference with Business Purpose (Count Six); and (7) Tortious Interference with Prospective Business Advantage (Count Seven). (*See generally* Compl.) In their Motion to Dismiss, Defendants argue that Plaintiffs fail to sufficiently allege facts that give rise to a cause of action. The Court assesses each of **Plaintiffs' claims in turn.**

### A.   **Takings Clause**

Plaintiffs allege that Defendants, through their enforcement of the fire code, violated the Takings Clause because "the Township took the property without the Plaintiff[s'] consent" and without just compensation. (Compl. 11.) In their Opposition Brief, Plaintiffs clarify that they allege

10

a claim of regulatory taking against the Township. (Pls.' Opp'n Br. *15-17, ECF No. 7[7]) Even if Plaintiffs properly alleged a regulatory takings claim in their Complaint, such claim fails.

The Takings Clause of the Fifth Amendment of the United States Constitution prohibits the taking of private property "for public use, without just compensation." U.S. CONST. amend. V. "The Takings Clause applies to state and local governments through the Fourteenth Amendment." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 151 (3d Cir. 2018). A regulatory taking occurs when a "regulation denies all economically beneficial or productive use" of a property interest. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (citations omitted). "There are two types of regulatory takings: (1) takings per se or total takings, where the regulation denies all economically beneficial productive use of the property; and (2) partial takings that, though not rendering the property idle, require compensation. . . ." *Nekrilov v. City of Jersey City*, 45 F.4th 662, 669 (3d Cir. 2022) (citing *Lucas*, 505 U.S. at 1019; *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978)). "[A] party challenging governmental action as an unconstitutional taking bears a substantial burden." *E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998).

The Court assesses Plaintiffs' claims under both theories of regulatory taking below.

    *i.*       *Total Takings or Takings Per Se*

Total takings or takings per se are those that deny the property owner *all* economically beneficial use of the property and render the property essentially idle. *Nekrilov*, 45 F.4th 662, 670 (3d Cir. 2022) (citing *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017); *Lucas*, 505 U.S. at 1030). "A taking has not occurred simply because a plaintiff has been denied the most profitable use of the property." *Id.* (citing *Andrus v. Allard*, 444 U.S. 51, 66 (1979)).

---

[7] Page numbers for Plaintiff's Opposition Brief will be preceded by an asterisk to refer to the page numbers atop the ECF header.

Plaintiffs assert that the Township's "regulatory taking did in fact render the [Premises] valueless to the Plaintiffs" because "the Plaintiffs were eventually shut down and not permitted to operate their business out of the [Premises]." (Pl.'s Opp'n Br. *16-17.) Plaintiffs argue that the "complete termination of business operations rises to the standard of rendering the [Premises] valueless for Plaintiffs['] business purposes." (*Id.* at *17.)

Here, Plaintiffs' argument fails. The Third Circuit has "decline[d] to recognize a general right to do business as a property interest cognizable under the Takings Clause" because "to hold otherwise would broaden the scope of the Takings Clause such that any business regulation could constitute a taking." *Nekrilov*, 45 F.4th at 670 (stating that not "every municipal act legalizing a business activity vests the business owner with a cognizable property right."). Further, the "Supreme Court has explained that 'business in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense.'" *Id.* at 669-670 (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (emphasis in original)).

Further, Plaintiffs fail to allege that they lost *all* beneficial use of the Premises. Defendants, specifically Lupo, allowed Plaintiffs to continue hosting events at the Premises if: (1) two Fire Watch professionals were present at every event; and (2) a detailed list of all events was reviewed and approved by Hauss. (Compl. 6-7.) Plaintiffs indeed continued to host events at the Premises (*id.* at 6-7), but failed to take corrective action as required for A-2 Use Groups by the Notice (*id.* at 5). Even if the Township did in fact restrict an economically beneficial use of the Premises, Plaintiffs' allegations are still meritless because the Premises could still be used for other purposes. *See Nekrilov*, 45 F.4th at 671 ("There is no total taking where the government seizes only one strand in the 'bundle' of property rights." (citing *Andrus*, 444 U.S. at 66)).

ii.     *Partial Taking*

Alternatively, a plaintiff may allege that the government action constitutes a partial taking under the *Penn Central* factors. The *Penn Central* factors require a plaintiff to show: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Penn Cent. Transp. Co.*, 438 U.S. at 124)). Although the test is flexible, the *Penn Central* "inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005). Although Plaintiffs do not provide any specific arguments regarding their allegations for partial taking, out of an abundance of caution, the Court considers the merits of this theory on the allegations in the Complaint.

Here, the Court finds that Plaintiffs' allegations are insufficient to sustain a partial-taking theory. Under the first prong, as discussed above, Plaintiffs have not alleged that the economic impact of the regulation is substantial because Plaintiffs are still able to utilize the Premises.[8] Moreover, under the second prong, the fire and zoning regulations enforced by the Township do not substantially interfere with Plaintiffs' "investment-backed expectations." *See Palazzolo*, 533 U.S. at 617. The Third Circuit has underscored that "distinct, investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest." *Pace Res., Inc. v. Shrewsbury Township.*, 808 F.2d 1023, 1033 (3d Cir. 1987). More importantly,

---

[8] Additionally, Plaintiffs "do not argue that the values of the underlying properties or leases have decreased." *Nekrilov*, 45 F.4th at 673 ("When evaluating a takings claim under the *Penn Central* factors, the economic impact of a regulation is usually measured in terms of its effect on the value of the property." (citations omitted)). Plaintiffs instead argue that they have been deprived of the "use and enjoyment of the [Premise]." (Compl. 11.)

the Supreme Court has specified that zoning laws and regulations are the "classic example . . . which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property." *Penn Cent.*, 438 U.S. at 125 (citations omitted). Here, the Township was enforcing zoning laws and regulations for public health, safety, and welfare reasons (Defs.' Moving Br. 6.), and therefore are permissible government actions that do not require compensation. *See Matter of Recycling & Salvage Corp.*, 586 A.2d 1300, 1314 (N.J. Super. Ct. App. Div. 1991) ("[T]he government need not normally compensate property owners for restrictions placed on property use pursuant to the police power (*i.e.,* for the health, safety or welfare of the public).").

In sum, the Court finds Plaintiffs' claim under the Takings Clause meritless. The Court, therefore, declines to consider Plaintiffs' arguments regarding just compensation. (*See* Compl. 13-14.) Plaintiffs' regulatory takings claims are dismissed without prejudice.

### B.      Due Process Claims under the Fifth Amendment

Nested in their claim under the Takings Clause, Plaintiffs also raise due process claims under the Fifth Amendment. (Compl. 14-16.) Such claims fail because Defendants are state officials and a state municipality. The "Fifth Amendment protection only applies when the *federal government* seeks to deprive a person of life, liberty or property." *Robinson v. Fauver*, 932 F. Supp. 639, 645 n.4 (D.N.J. 1996) (emphasis in original) (citing *Bloom v. State of Illinois*, 391 U.S. 194 (1968)); *see Kelly v. Borough of Sayreville, N.J.*, 107 F.3d 1073, 1076 (3d Cir. 1997) (affirming that a due process claim against a municipality and a state official is analyzed under the Fourteenth Amendment, not the Fifth Amendment). Accordingly, all due process claims against Defendants are dismissed with prejudice.

C. **Equal Protection Clause Claims under the U.S. Constitution and N.J. Constitution**[9]

In support of their equal protection claims, Plaintiffs allege that the Township "harassed, intimidated, bullied[,] and threatened" them "due to Plaintiff[s'] race and ethnicity." (Compl. 18.) Specifically, Plaintiffs allege that the Township did not initiate actions regarding claims and allegations of ordinance violations until after Defendants became aware of an event titled "Boogie Nights" hosted at the Premise. (*Id.* at 17.) In doing so, Plaintiffs assert that the "Township's actions can be interpreted as an attempt to stereotype African American [10] culture and music" and exemplify "discrimination and prejudice against African Americans." (*Id.* at 17-18.) Plaintiffs allege that their interest in the Premises was adversely affected because Plaintiffs were "intentionally singled out because of Plaintiff[s'] race by the Defendants." (*Id.* at 24.) Given the

---

[9] Although Plaintiffs allege claims under the New Jersey Civil Rights Act ("NJCRA") in their Opposition Brief (Pl.'s Opp'n Br. *19-20), nowhere in Plaintiffs' Complaint do Plaintiffs allege an equal protection claim under the NJCRA; instead, Plaintiffs assert a claim under the Equal Protection Clause of the New Jersey State Constitution. (Compl. 23-25.) It is well established that "[w]hen deciding a motion to dismiss, it is the usual practice for a court to consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record." *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998) (citation omitted); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that the court, when considering a motion to dismiss, "may not consider matters extraneous to the pleadings"). "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 387 (D.N.J. 2019) (quoting *Frederico*, 507 F.3d at 202). Accordingly, "[a]lthough Plaintiff[s'] opposition to Defendant[s'] [M]otion to [D]ismiss contains numerous factual allegations that *may*—in a pleading that meets the requirements of Rule 8(a)—establish the requisite elements of a discrimination claim, Plaintiff[s] may not amend [their C]omplaint by way of an opposition brief." *Rosado v. Mueller*, No. 15-3999, 2016 WL 4435672, at *4 (D.N.J. Aug. 17, 2016) (emphasis in original). The Court, therefore, does not consider Plaintiffs' claims as they may pertain to a claim under the NJCRA.

[10] In their Complaint, Plaintiffs assert that "Plaintiff is of African descent and therefore a protected class member[.]" (Compl. 24.) In this matter there are three distinct plaintiffs—one limited liability company (Supreme) and two individuals (Jason Robinson and Danyale Robinson). (*See generally* Compl.) Plaintiffs do not specify which of the individuals are of African American descent.

overlapping facts and allegations, the Court analyzes Plaintiffs' § 1983 and New Jersey equal protection claims simultaneously.

The Fourteenth Amendment provides that "[n]o State[11] shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "This is essentially a direction that all persons similarly situated should be treated alike." *Shuman ex rel. v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citation omitted). In order to successfully bring a due process claim under the Fourteenth Amendment, a plaintiff must adequately allege that they were purposefully discriminated against and "that they received different treatment from that received by other individuals *similarly situated*." *Id.* (citations omitted). "Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects." *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quotation marks and citation omitted). Similarly, although the term "equal protection" is not explicitly used, the New Jersey Constitution has been "interpreted to confer an analogous right to that available under the Fourteenth Amendment of the U.S. Constitution." *Rojas v. City of New Brunswick*, No. 04-3195, 2008 WL 2355535, at *26 (D.N.J. June 4, 2008); *Palardy v. Township of Millburn*, No. 15-2089, 2016 WL 1732379, at *4 (D.N.J. May 2, 2016) (stating "New Jersey courts have found there to be '[a] concept of equal protection . . . implicit in Art. I, par. 1 of the 1947 New Jersey Constitution[.]'" (quoting *McKenney v. Byrne*, 412 A.2d 1041, 1047 (N.J. 1980))).

"To establish discriminatory impact in a racial discrimination case, [plaintiffs] must show that similarly situated individuals of a different race were treated differently." *Doe ex rel. Doe v.*

---

[11] "Municipalities constitute the state for purposes of Fourteenth Amendment protections." *Associated Builders & Contractors, E. Pa. Chapter, Inc. v. County of Northampton*, 376 F. Supp. 3d 476, 492 (E.D. Pa. 2019), *aff'd sub nom.*, *Associated Builders & Contractors E. Pa. Chapter Inc v. County of Northampton*, 808 F. App'x 86 (3d Cir. 2020) (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989)).

*Lower Merion Sch. Dist.*, 665 F.3d 524, 550 (3d Cir. 2011). Here, construing the Complaint in the light most favorable to Plaintiffs, there are no facts asserted that Plaintiffs were treated differently than any other similarly situated business owners. In fact, there is no mention of any other similarly situated business owners in Plaintiffs' Complaint. (*See generally* Compl.)

Plaintiffs' equal protection claims are therefore dismissed without prejudice.[12]

### D.    Title VI of the Civil Rights Act of 1964

Next, Plaintiffs assert that the Township is subject to Title VI of the Civil Rights Act of 1964 ("Title VI") and is prohibited from discriminating on the basis of race, color, or national origin. (Compl. 19-21.) Plaintiffs allege that the Township receives federal financial assistance and is therefore subject to Title VI.

Indeed, "Title VI prohibits intentional discrimination based on race in any program that receives federal funding." *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011). In asserting a Title VI claim, "a plaintiff who seeks recovery under a theory of purposeful [or intentional] discrimination must demonstrate that governmental authority implemented the facially neutral policy at issue 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *S. Camden Citizens in Action v. N.J. Dep't of Env't Prot.*, 254 F. Supp. 2d 486, 495 (D.N.J. 2003).

---

[12] Plaintiffs assert a *Monell* claim against the Township in their Opposition Brief (Pl.'s Opp'n Br. *20-22), but not in their Complaint. Again, the Court only considers allegations raised in the Complaint, *see supra* note 10, and thus declines to discuss further.

While the Township may be subject to Title VI,[13] Plaintiffs' Complaint does not adequately allege facts that the Township *intentionally* discriminated against Plaintiffs due to their race. Plaintiffs assert that the Township enforced "unwarranted alleged ordinance violations against Plaintiff[s]" "as an attempt to suppress African American culture and music" by prohibiting Plaintiffs' "Boogie Nights" event. (Compl. 18.) Yet, Shah's April 11, 2022 letter explains that the Township revoked the right to operate events after May 22, 2022 "[d]ue to safety, health, and welfare" reasons. (Shah Letter.) In fact, Shah's letter outlines all the issues cited in previous inspections and correspondences that Plaintiffs had yet to fully address. (*Id.*) Importantly, Shah's letter explicitly states that Plaintiffs did not have the proper approvals, including an A-2 Use Group Certificate, to host alcohol-serving events such as "Boogie Nights." (*Id.*) Plaintiffs, without addressing such explanations as to why the Township enforced its regulations and ordinances, continue to unilaterally aver that the Township was motivated by racial discrimination. The Court, without more, finds Plaintiffs' allegations inadequate to demonstrate intentional racial discrimination by Township against Plaintiffs. *See Iqbal*, 556 U.S. at 678; *Erie CPR v. PA Dep't of Transportation*, 343 F. Supp. 3d 531 (W.D. Pa. 2018) (finding that at the motion to dismiss stage, conclusory averments that defendants acted unlawfully or with discriminatory intent are insufficient to state a claim for intentional race-based discrimination under Title VII).

Moreover, Plaintiffs assert that the Township initiated actions against Plaintiffs only *after* becoming aware that a "Boogie Nights" event was to be hosted at the Premises. (Compl. 17.) To the contrary, Plaintiffs' Complaint and cited documents indicate that the Township conducted its

---

[13] Plaintiffs seemingly allege their Title VI claim against the Township. (*See* Compl. 19-21.) Indeed, the Third Circuit has found that "[i]ndividual liability may not be asserted under Title VI," *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011), "because Title VI forbids discrimination only by recipients of federal funding[.]" *Shannon v. Lardizzone*, 334 F. App'x 506, 508 (3d Cir. 2009).

first inspection of the Premises two months *prior* to Shah's April 11, 2022 letter mentioning "Boogie Nights." (Compl. 4, 17; Shah Letter.)

Again, without more to show that the Township's decisions were motivated by intentional racial discrimination against Plaintiffs, Plaintiffs' Title VI claim fails. Plaintiffs' claim under Title VI is therefore dismissed without prejudice.

### E.       Due Process Clause under the Fourteenth Amendment

Under Count IV, Plaintiffs plead both procedural and substantive due process violations under the Fourteenth Amendment. (*See* Compl. 21-23.) Without pleading facts specific to each due process violation, Plaintiffs generally assert that they were "not given an adequate opportunity to defend against governmental action" and "cure any alleged violations." (*Id.* at 22.) Plaintiffs assert that "had [they] been given the opportunity to defend [themselves], Plaintiff[s] would have done so in accordance with [the] law." (*Id.* at 23.) As a consequence, Plaintiffs allege that they lost use and enjoyment of the Premises, as well as its "intended business use and benefit." (*Id.* at 22.)

####         *i.       Substantive Due Process*

"To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (citing *United Artists Theatre Circuit, Inc. v. Township of Warrington, Pa.*, 316 F.3d 392, 400-02 (3d Cir. 2003)). This standard encompasses only "the most egregious official conduct." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

In their Opposition Brief, Plaintiffs assert that Defendants "racially targeted Plaintiffs and their business and imposed variances and violations upon them" based on the fact that "Plaintiffs were not subjected to the same until well over a year operating with the approvals from the

Defendants." (Pls.' Opp'n Br. *24.) Plaintiffs, therefore, argue that their substantive due process rights were violated because "Plaintiffs were not given sufficient time" to meet the new requirements. (*Id.*)

"[T]he Third Circuit has held that inconsistent application of zoning requirements [and] delaying permits and approvals . . . is not the type of behavior that shocks the conscience." *H & R Grenville Fine Dining, Inc. v. Borough of Bay Head*, No. 10-325, 2011 WL 6339815, at *17 (D.N.J. Dec. 19, 2011) (citing *United Artists Theatre Cir., Inc. v. Township of Warrington, PA*, 316 F.3d 392, 402 (3d Cir. 2003)). Moreover, it is not the law that "any zoning controversy that interfered with the use and enjoyment of property would automatically shock the conscience." *Tucker Indus. Liquid Coatings, Inc. v. Borough of E. Berlin*, 656 F. App'x 1, 6 (3d Cir. 2016). The fact that Defendants delayed their enforcement of fire codes and regulations upon Plaintiffs is insufficient to state a substantive due process claim. *See Eichenlaub v. Township of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004) ("What is clear is that this [substantive due process] test is designed to avoid converting federal courts into super zoning tribunals."); *Trotta v. Borough of Bogota*, No. 12-2654, 2016 WL 3265689, at *7 (D.N.J. June 6, 2016) (stating that it is improper for courts to become a "zoning board of appeals.").

Further, as previously noted, Plaintiffs' allegations regarding Defendants' alleged racial discrimination in enforcing fire code regulations amount only to unsupported accusations because "there is an absolute dearth of facts within the . . . pleading to even inferentially support this broad assertion." *See Tucker Indus. Liquid Coatings, Inc.*, 656 F. App'x at 7. Accordingly, the Court dismisses Plaintiffs' substantive due process claim without prejudice.

ii.       *Procedural Due Process*

"A procedural due process claim is subject to a two-stage inquiry: (1) whether the plaintiff has a[n] . . . interest protected by procedural due process[;] and (2) what procedures constitute due process of law." *Fanti v. Weinstock*, 629 F. App'x 325, 330 (3d Cir. 2015) (citation omitted). "Due process requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (quotation omitted). A state provides adequate procedural due process where it "affords a full judicial mechanism for with which to challenge the 'administrative decision'" in question. *Nicolette v. Caruso*, 315 F. Supp. 2d 710, 721 (W.D. Pa. 2003) (citation omitted).

To the extent Plaintiffs set forth the same arguments alleged in their substantive due process claim regarding racial targeting, delayed enforcement of regulations, and insufficient time to cure the violations, the Court also dismisses those arguments. Plaintiffs further allege, however, that although they had an opportunity to be heard, the "hearing was not fair and impartial" and the "decisionmakers" were biased because they were controlled by Defendants. (Pls.' Opp'n Br. *26.)

Certainly, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citations omitted). First, and importantly, Plaintiffs fail to allege which hearing they are referring to in arguing that they did not receive procedural due process—the public December 17, 2020 Variance Application hearing, or the June 8, 2022 appeals hearing before the Construction Board of Appeals. Second, Plaintiffs' Complaint fails to include details about the Construction Board of Appeals hearing. (*See generally* Compl.; Pls.' Opp'n Br.) On the face of the Complaint, therefore,

it is unclear how Plaintiffs were allegedly deprived of a fair and impartial hearing or who the alleged biased decisionmaker was.

Having found that Plaintiffs' substantive and procedural due process claims fail, the Court finds it unnecessary to address the issue of qualified immunity at this time. *See Hickox v. Christie*, 205 F. Supp. 3d 579, 589 (D.N.J. 2016) (stating that for a qualified immunity analysis, the court must first "determine whether the facts, and inferences drawn therefrom, taken in the light most favorable to the plaintiff, establish that the official's conduct violated a constitutional right.") (quoting *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005)). Accordingly, Plaintiffs' substantive and procedural due process claims are dismissed without prejudice.

### F.    Tortious Interference Claims

Finally, Plaintiffs assert that they were "deliberately targeted" by Defendants and that Defendants knowingly interfered with Plaintiffs' business relationships and prospective business relationships—namely with clients who rent the Premises to host events. (Compl. 25-30.) As a result, Plaintiffs state that they suffered damages, including the "loss of business profits, relocation expenses, and other costs associated with rebranding and salvaging their client list." (*Id.* at 27.) The Court considers Plaintiffs' Tortious Interference with Business Relations claim (Count VI) and Tortious Interference with Prospective Business Advantage claim (Count VII) together.

The elements of a tortious interference with economic advantage claim are: (1) a "reasonable expectation of economic advantage"; (2) interference done intentionally and with malice; (3) injury, in the sense of the loss of prospective gain; and (4) damages. *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) (citing *MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996)). "The protectable right need not be a contract, but 'there must be allegations of fact giving rise to some reasonable expectation of economic advantage.'" *Id.*

(quoting *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31 (1989)). The elements are the same for tortious interference with a contractual relationship or business relations. *See A. & M. Wholesale Hardware Co.*, No. 13-475, 2014 WL 714938, at *8 (D.N.J. Feb. 24, 2014).

A plaintiff need not identify multiple lost business opportunities to establish a cause of action for tortious interference, but it must identify at least one. *Austar*, 425 F. Supp. 3d at 358 (citing *Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.*, 332 F. App'x 787, 790 (3d Cir. 2009)). Here, Plaintiffs do not allege what business opportunities and profits they have lost.

Moreover, Plaintiffs fail to adequately allege a showing of malice. "[M]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse." *Id.* at 359 (citing *Printing Mart-Morristown*, 563 A.2d 31, 39 (1989)). The Complaint, however, only asserts generally that Defendants chose to "target a minority business and prevent it from operating successfully within the municipality." (Compl. 29.) There are no other factual allegations pled to support that Defendants acted with any malice in enforcing lawful codes and regulations. The pleading, therefore, fails to plead sufficient facts to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009) ("Rule 8 does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect [the] complaint to survive a motion to dismiss.").

Accordingly, Plaintiffs' tortious interference claims are dismissed without prejudice.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, **Defendants' Motion to Dismiss is granted**. The Court will issue an Order consistent with this Memorandum Opinion.



_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE